INHABITANTS OF FAYETTE *vs.* INHABITANTS OF CHESTERVILLE.

Kennebec.   Opinion January 6, 1885.

*Paupers.   Sanity.   Mental capacity.   Experts.   Physician.   Evidence.*

A child is capable of gaining a settlement for himself when he arrives at the age of twenty-one years, if he has intelligence enough to form and retain an intention in respect to his dwelling-place, mind sound enough to give him will and volition, and sufficient power and control over his mind and his action to enable him to choose a home for himself. He must have mental capacity to enable him to act with some degree of intelligence in choosing a new home.

Whether a physician, called in a case, is qualified to testify as an expert upon questions of insanity, is a question of fact for the presiding judge to decide, and his decision is usually final. In extreme cases where a serious mistake has been committed, through some accident, inadvertence or misconception, his action may be reviewed.

Skillful and reputable physicians, although not experts upon the subject, may testify to the mental condition of their patients when they have adequate opportunity of observing and judging of their mental qualities. But this does not embrace a case where a single examination was made by a physician to qualify himself as a witness in a pending litigation.

ON exceptions and motion to set aside the verdict from the superior court.

Assumpsit for pauper supplies furnished by the plaintiff town to Fred J. Fales from January to May, 1882, whose pauper settlement was alleged to be in the defendant town.

At the trial it was admitted that the father of the pauper had his settlement in Chesterville at the time the pauper became of age, December 20, 1877. And an important question in the case was, whether the pauper had mental capacity sufficient to acquire a settlement of his own; his father, with whom he continued to reside, having acquired a new settlement in Fayette.

The verdict was for the defendants.

The plaintiffs requested the several instructions following, none of which were given except as appears in the charge.

"IV. That if the jury find that Fred J. Fales, when he became twenty-one, had such control of himself and of his mind, that he was capable of free volition and had power to choose his home, then he had such capacity to acquire a settlement as the statute requires.

"V. That to this end a lower degree of intelligence is required than in the making of a contract.

"VI. That if the pauper, when he became twenty-one, had sufficient *capacity* to choose a residence and to form an intention to remain in it, that would constitute a capacity to acquire a settlement within the meaning of the statute, though he did not actually leave his father's home.

"VII. That the law does not require that he should have actually *exercised* his capacity of acquiring a settlement or of forming an intention, but simply that he should have such capacity.

"VIII. That the law does not require that the pauper should *have actually formed* any fixed intention with regard to a home, or should have *actually* chosen any new home, if he had sufficient mental *capacity* so to do under the rules already given."

The presiding justice instructed the jury as follows:

"But there is also another rule fixed by the legislature with reference to the settlement of paupers, and that is, that a child shall have the settlement of his father, if he has any in the state, if not, of his mother, but not of either after he becomes of age and has capacity to acquire one for himself. He does not have the settlement of either the father or the mother acquired after he has become of age and has capacity to acquire one for himself.

"Now you have already observed from the arguments of counsel and from the character of the testimony, that has been admitted here, that it is important to determine what may fairly and reasonably be supposed to have been in the contemplation of the legislature in using this phrase, "capacity to acquire one for himself." That is, capacity to acquire a settlement. It seems to me, in the first place, that the legislature must have referred solely to the mental capacity. It seems to me that any other rule would be extremely unsatisfactory, unsafe and fallacious. It seems to me that bodily infirmities, bodily disease, could not be a safe and a reliable test to determine the capacity to acquire a settlement.

"Suppose, for instance, that a beloved daughter were afflicted with pulmonary consumption at the moment she arrived at the age of twenty-one years, and should suffer from that disease for several years thereafter, and by reason of that should remain with her parents, apparently subject to their control and authority, and receives her support from them just as she did just prior to her arriving at that age. It would not, I apprehend, be contended for a moment, and has not, I may properly say here, been contended by the counsel for the defence, that in such a case there would be an incapacity, within the meaning of this statute, to acquire a settlement. And so suppose a son had returned from the army, having lost both arms, having lost the physical capacity to earn his living. It might be said that there was a moral fitness and propriety, flowing from considerations of sentiment and family affection, in his remaining in the family, apparently subject to the control and authority of the parents, and receiving his support from them, yielding the same kind of subjection and dependence as prior to his arriving at the age of twenty-one years. It would be an extremely unsatisfactory and fallacious test to say that by reason of his physical infirmities, his incompetency to earn his livelihood, he hadn't capacity to acquire a settlement for himself, and therefore must be considered as a child after he arrived at the age of twenty-one years as before, if that feebleness or incompetency was, by reason of physical infirmity, prolonged into the maturer years.

"I say to you, therefore, that the bodily diseases, the physical infirmities of a person are not the test by which to determine the capacity to acquire a settlement under this particular clause in the statute. They are admissible and material evidence only so far as they tend to throw light upon the mental condition."

The remainder of the charge upon the question to which the requests relate, and other material facts are stated in the opinion.

*Baker, Baker and Cornish,* for the plaintiffs.

We submit that the exclusion of the question to Dr. Martin was plainly wrong, and so far as we can find, stands unsupported by a single authority in England or the United States.

The law of England has been conclusively shown to be uniform in admitting even non-professional witnesses to give their opinion on a question of mental condition.

Opinion of DOE, J., in *State* v. *Pike*, 49 N. H. 408 ; *Hardy* v. *Merrill*, 56 N. H. 227 ; see *Robinson* v. *Adams*, 62 Maine, 410 ; *Hathorn* v. *King*, 8 Mass. 371 ; *Dickinson* v. *Barber*, 9 Mass. 225 ; *Com.* v. *Rich*, 14 Gray, 337 ; *Hastings* v. *Rider*, 99 Mass. 622 ; *Lewis* v. *Mason*, 109 Mass. 175 ; *Heald* v. *Thing*, 45 Maine, 392.

By R. S., c. 24, § 1, par. 6, "a person of age, having his home in a town for five successive years without receiving supplies as a pauper, directly or indirectly, has a settlement therein."

What is necessary to constitute a "home" under the statute ? The unvarying answer of the decisions is—residence coupled with intention. *Warren* v. *Thomaston*, 43 Maine, 406 ; *Gardiner* v. *Farmingdale*, 45 Maine, 537.

If the pauper then on coming of age has capacity to form and retain an intention as to his home, his place of residence, he has that capacity to acquire a settlement which the statute demands.

Such a rule should have been given to the jury in a simple form and such is the import of the requests. But the charge added new and complicated elements to these simple requirements of the statute, especially in the clause, "that he must be able to perform with some degree of intelligence the simple and common kinds of business usually and ordinarily involved in the act of

taking up a new residence." Counsel cited : *Taunton* v. *Middleboro*, 12 Met. 37 ; *Townsend* v. *Pepperell*, 99 Mass. 40.

*Herbert M. Heath*, for the defendants.

PETERS, C. J. Whether the pauper had mental soundness sufficient to render him capable of being emancipated from parental control by arriving at the age of twenty-one years, and of acquiring a settlement for himself after that time, was one of the questions at the trial of the cause to the jury. No doubt, it should be mental soundness amounting to sanity,—sanity in respect to the matter to be investigated. The test must be one peculiar to the question to be decided. It is adaptable to circumstances.

The judge submitted to the jury this test : "To find that a person has capacity to acquire a settlement, within the meaning of the statute, you must find in the first place, that he had intelligence enough to form and retain an intention with respect to his dwelling-place ; that he had a mind sound enough to give him will and volition of his own, and such power and control over his mind and his action as to enable him to choose a home for himself ; that he must have mental capacity sufficient to act with some degree of intelligence and some intelligent understanding with respect to the choice of his dwelling-place, and to form some rational judgment in relation to it." Different judges may give different definitions, varying in the letter — in substance the same. We do not see why the rule framed by the judge in the present case is not a correct one.

It was further said by the judge : "And he must be able to perform with some degree of intelligence the simple and common kinds of business usually and ordinarily involved in the act of taking up a new residence." This additional explanation of the test is well enough, and certainly is not exceptionable.

The plaintiffs were not entitled, upon their requests, to any other or more favorable instructions than those given.

An exception is taken to the exclusion of this question proposed by the plaintiffs to their witness, Dr. Martin : "From your

examination at that time what in your judgment was his (the pauper's) mental condition?" From the manner in which the point is presented to us by the case, we think the ruling must stand.

We infer that the witness was not allowed to answer the question for the reason that the judge did not think him qualified to testify as an expert. Such must be the implication of the refusal, unaccompanied with explanation. Undoubtedly many physicians are qualified to testify as experts upon questions of insanity. They may not be, as a rule, of the most eminent class of experts. Whether this witness was qualified to testify as an expert, was a question of fact for the presiding judge, and his decision of such a question is usually final. In extreme cases, where a serious mistake has been committed through some accident, inadvertence, or misconception, his action may be reviewed. This is not such an instance.

The plaintiffs contend that, if not admitted as a professional or practical expert, the witness should have been allowed to express his opinion as a physician who had made a personal examination. The rule excluding persons not experts from testifying to their opinions upon questions where insanity is alleged, has admitted, either as an illustration of the rule itself or as an exception to it, skillful and reputable physicians to testify to the mental condition of their patients when they have had adequate opportunity of observing and judging of their mental qualities. That is not this case. Here Dr. Martin was not an attending physician. He made a single examination, *pendente lite*, in order to inform himself as a witness. He stood in a position to be tempted to participate in the prejudices of the party calling him as a witness. See *Gardiner* v. *Farmingdale*, 45 Maine, 537.

Finally, it is contended that the rule which excludes opinion evidence by witnesses acquainted with the person whose sanity is questioned, should be abrogated altogether. We are not prepared to admit the propriety of so radical a change in the practice of our courts, although we are aware that many courts

are at the present day inclined that way. It is easy to see, and experience teaches us, that there are advantages upon either side of the question — to either mode of practice. It is correctly said by those who advocate the admission of such evidence, that witnesses who have not some aptitude in narrating events, an ability for describing details and particulars, although possessing good judgment in forming estimates and conclusions, are very often not fairly appreciated ; that it is not easy to draw a line between matters of observation and what is a matter of judgment founded on observation.

On the other hand, such evidence is exceedingly apt to carry a force and impression which the real facts are not deserving of. Opinions are easily, and unconsciously to the possessors of them, colored by feeling and prejudice. Every judge experienced at *nisi prius* knows how common a thing it is to see a cloud of witnesses arrayed at the witness-stand to testify in a matter of opinion, and how difficult it is to contend against the pressure, however ill-founded the testimony may be. Where it is a collateral question, or where a plain case, the objection to such testimony is not so meritorious, and in such circumstances the objection is not often interposed. But where the issue — sanity or insanity — is directly raised, and the question is a doubtful one, the rule which excludes the opinions of non-professional witnesses, works favorably. The issue is not generally simple enough for a witness to pass his judgment upon. There are various forms and kinds of insanity or mental unsoundness, many of which cannot be easily or accurately defined, the subject itself in some of its aspects being beyond the reach of human investigation. The popular sentiment upon the subject of insanity differs from the legal standard in most cases.

The tendency in our practice has been to allow witnesses who are not experts a good deal of latitude in the expression of opinion, short of declaring their judgments upon the point mainly and directly in issue. As was said by KENT, J., in *Robinson v. Adams*, 62 Maine, at p. 410 : " Certainly nothing less than a distinct expression of the opinion of the witness, given as such opinion directly, comes within our rule." A witness under the

direction of the court, may be permitted to describe peculiarities,. conditions and situations, conduct and changes.    In *Robinson* v. *Adams, supra,* it was deemed not objectionable for a witness to say that she did not observe any failure of mind and nothing: peculiar in a person.    In *Stacy* v. *Port. Pub. Co.* 68 Maine,. 279, it was held admissible for a witness to testify that a person: was intoxicated at a time named.

The motion cannot justly be sustained.    There is much to: show that the pauper was a man in body and a child in mind.

*Motion and exceptions overruled.*

Walton, Danforth, Virgin, Foster and Haskell, JJ.,. concurred.